UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES**,<br><br>Plaintiff,<br><br>v.<br><br>**DEIONTA HARDEN ET AL**,<br><br>Defendants. | 2:20-cr-20280-TGB-EAS<br><br>HON. TERRENCE G. BERG<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 20)** |

This is a drug conspiracy case. The indictment charges Defendants Deionta Harden and Rhonda Hubbard with: (1) Conspiracy to Manufacture, to Possess with Intent to Distribute, and to Distribute Cocaine Base in violation of 21 U.S.C. § 846; (2) Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); and (3) Possession with Intent to Distribute Heroin in violation of 21 U.S.C. § 841(a)(1). Now before the Court is Defendant Harden's motion to suppress (ECF No. 20), which asserts that four search warrants in this case were issued without probable cause, and thus that the subsequent searches were conducted in violation of Defendant Harden's Fourth Amendment rights. Defendant Harden asks the Court to suppress all evidence, statements, and fruits obtained as a result of the execution of these warrants. The other defendant in this case, Rhonda Hubbard, filed a notice of joinder (ECF No. 22).

1

Having reviewed the briefing in this case and heard oral argument on the issues, Defendant's motion to suppress will be **GRANTED IN PART** and **DENIED IN PART**.

## I.     BACKGROUND

On June 25, 2020, an indictment was filed charging Defendant Deionta Harden and Defendant Rhonda Hubbard with (1), Conspiracy to Manufacture, to Possess with Intent to Distribute, and to Distribute Cocaine Base in violation of 21 U.S.C. § 846; (2), Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); and (3), Possession with Intent to Distribute Heroin in violation of 21 U.S.C. § 841(a)(1). ECF No. 1.

There are four search warrants challenged here: (1), issued on February 3, 2020, a search warrant to "install, maintain, and remove a GPS tracking device on a Black 2014 Dodge Durango" (ECF No. 20-2); (2), issued on February 24, 2020, a search warrant authorizing search of two locations, 48631 SI94 Service Drive Apartment #205 (the "Harbour Club Apartments") and 585 Shadowlawn Street (ECF No. 20-3); (3), issued on February 25, 2020, a search warrant to search a storage unit (#315) located at 6535 Middlebelt Road in Romulus, Michigan (ECF No. 20-4); and (4), issued on March 5, 2020, a search warrant authorizing a second search of 585 Shadowlawn Street (ECF No. 31-5).

2

On February 3, 2020, police obtained the warrant to attach a GPS device to the black Dodge Durango. The affidavit in support of the warrant included information received from four informants and tipsters in July of 2018, September of 2019, and October of 2019. In July of 2018, a confidential informant told officers that they could purchase an "8 ball" of crack cocaine from Defendant Harden in the parking lot of 48420 Denton Road at the Harbour Club Apartments. ECF No. 20-2, PageID.78. Police confirmed that Harden had a criminal record including several felony drug offenses. ECF No. 20-2, PageID.77 The confidential informant was provided pre-recorded Michigan State Police funds, met with Defendant Harden, and purchased crack cocaine—however, the informant "did not stay in contact with" the officer after the buy. ECF No. 20-2, PageID.71. Also in July of 2018, another informant who had been arrested asked to speak with a detective. ECF No. 20-2, PageID.78. The individual stated he could purchase crack cocaine from "T," that T lived at 48420 Denton Road, that "T" lived with his girlfriend Rhonda, and that "T" drove a white four-door vehicle with tinted windows. Like the first informant, the individual made no more contact with police after giving this information.

Over a year later, in September 2019, an anonymous tipster told officers that a Black male, who goes by the name of "T" and drives a Chrysler 200, was selling crack cocaine out of 48631 SI94 Service Drive Apt. 205 in Belleville, Michigan. ECF No. 20-2, PageID.78. This is the

same location previously described as 48420 Denton Road—the Harbour Club Apartments. The officer confirmed that Apartment 205 was leased by Defendant Hubbard, who had moved out of her previous apartment in the same Harbour Club complex. The final tip came via mail to the police department in October of 2019. ECF No. 20-2, PageID.78. The letter, which had no sender information, stated there was a "trap house" located in the Harbour Club Apartments off I94 Service Drive and the apartment was being rented by "T." An officer conducted a check of this area and observed a white Chrysler 200.

The Chrysler 200's registration revealed that the vehicle was associated with Defendant Rhonda Hubbard, who resided at 585 Shadowlawn Street in Inkster, Michigan. *Id*. at PageID.77. Further records checks confirmed that Defendant Harden was also associated with the Shadowlawn address. *Id*. From November 2019 to January 2020, officers conducted surveillance and two trash pulls at the Shadowlawn residence. Police observed the white Chrysler 200 at the Shadowlawn residence and, on November 24, 2019, attached an electronic surveillance device to it. ECF No. 20-2, PageID.79. On November 24, 2019, officers also conducted a trash pull at the Shadowlawn address which produced evidence described as "residency" records, that is, documents showing that both Defendants were living at the location. *Id*.

On December 12, 2019, an officer observed a black Dodge Durango in the parking area of the Harbour Club Apartments and, upon running the license plate, found it registered to Defendant Hubbard and another person. ECF No. 20-2, PageID.79. A few days later, on December 16, officers went to the Shadowlawn residence to remove the surveillance device from the Chrysler 200 because it had not been driven in two weeks. *Id*. While there, officers also conducted a trash pull and found two clear plastic sandwich baggies that were knotted which, according to the officers, was "consistent with the storage and transport of narcotics." *Id*. Officers also saw the black Dodge Durango parked in the driveway of the Shadowlawn residence. *Id*.

In January of 2020, while conducting surveillance in the area of the Harbour Club Apartments, an officer again observed the black Dodge Durango parked and unoccupied. ECF No. 20-2, PageID.80. Digital surveillance equipment was installed near 585 Shadowlawn. *Id*. Through this surveillance Defendant Harden was observed exiting the Shadowlawn residence and driving away in the black Dodge Durango on January 30, 2020. *Id*. Defendant Harden was observed as the sole occupant/driver of the Durango twice more in the next four days. *Id*.

Over the next two months, police observed a number of "short stay" visits to the Harbour Club Apartments while Defendant Harden was also present. In late February, police arrested a driver who had just left the Harbour Club Apartments and discovered drugs in his vehicle. ECF No.

20-3, PageID.101-102. On February 24, police obtained a warrant to search the Shadowlawn residence and the Harbour Club Apartments. During those searches, Defendant Harden was arrested, and police discovered keys to a storage unit. ECF No. 20-4, PageID.122-123. As they were investigating the storage unit about four hours later, police saw the Dodge Durango arrive at the storage facility and quickly depart. *Id.*

On March 1, about a week after his arrest, Defendant Harden called Defendant Hubbard from jail and told her to return to the Harbour Club Apartments, collect some hidden narcotics he believed the police had missed in their initial search, and bring them back to the Shadowlawn residence. ECF No. 31-5, PageID.311-13. In a subsequent call, Defendant Hubbard said that she had collected some, but not all, of the hidden drugs. Police obtained a warrant, searched the Harbour Club Apartments a second time on March 5th, and recovered the drugs Defendant Hubbard had left behind. *Id.* at PageID.312. In other calls, Defendant Hubbard told Defendant Harden that she had recovered heroin from the Harbour Club Apartments, that she had "cooked" narcotics for the first time at the Shadowlawn residence, and planned on doing so again, that she had "sold some of the narcotics to an unknown subject for $10,000.00 and she was planning on selling more," and that, while Harden was incarcerated, she generally planning on running "the narcotics sales while . . . a subject named 'Randall' was going to run the prostitution side of the 'business.'" *Id.* at PageID.312-13. Hubbard also told Harden that she had

"abandoned" the Harbour Club apartment, and that she would take care of the Shadowlawn residence while Harden was incarcerated. *Id.* On the basis of those calls, police obtained a warrant and searched the Shadowlawn residence a second time.

## II.   LEGAL STANDARD

The Fourth Amendment guarantees that the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The "core" of the Fourth Amendment is the right of a citizen to be "free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31, 121 S. Ct. 2038, 2041, 150 L. Ed. 2d 94 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008)

The Supreme Court held in *United States v. Jones* that the "installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements," constitutes a "search" under

the Fourth Amendment requiring probable cause. 565 U.S. 400, 404 (2012). Probable cause demands an assessment of whether there is "a 'fair probability," given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *U.S. v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (quoting *U.S. v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985)). When evaluating an application and affidavit for a search warrant, the magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983)

## III.      ANALYSIS

Defendant Harden seeks to suppress all evidence seized during the execution of these warrants on the grounds that the affidavits offered in support of the search warrants failed to set out sufficient facts to establish probable cause.

### a. February 3, 2020 Search Warrant (Dodge Durango Tracker)

The first search warrant was issued on February 3, 2020, and provided that a GPS tracking device could be installed on a black 2014 Dodge Durango. ECF No. 20-2, PageID.82. Defendant's motion contends that the affidavit was insufficient to support probable cause because it

8

failed to establish the reliability of the confidential and anonymous informants and did not provide a sufficient nexus between the suspected criminal activity and the Dodge Durango. The government disagrees and argues that probable cause was established through evidence of "Harden's continual and ongoing drug trafficking," and the presence of the Dodge Durango at the Shadowlawn address and the Harbour Club Apartments—both locations "which were involved in drug trafficking." ECF No. 24, PageID.142; ECF No. 31, PageID.242.

A tracking-device warrant may be issued "if a supporting affidavit establishes probable cause to believe that the device will uncover evidence, fruits, or instrumentalities of a crime." *United States v. Coleman*, 923 F.3d 450, 454 (6th Cir. 2019). The question, of course, is not whether drugs or evidence of drug trafficking would be found *in* the Dodge Durango, but instead whether tracking the vehicle would uncover evidence, fruits, or instrumentalities of drug trafficking.

"Where, as here, the bulk of the information in the affidavit comes from a confidential source, a court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances analysis." *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006). To qualify a confidential informant as reliable, an "affiant need only specify that the confidential informant has given accurate information in the past." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001). An affidavit that "supplies little information" concerning an

9

informant's reliability" may still support a finding of probable cause "if it includes sufficient corroborating information." *Coffee*, 434 F.3d at 893. That is, if police subsequently confirm some or all of what a tipster or informant has said, that tip may support probable cause even if the affidavit does not include information about the tipster's reliability.

The first confidential informant in this case contacted an officer in July of 2018 and informed the officer that Defendant Harden was trafficking drugs out of the Harbour Club Apartments. ECF No. 20-2, PageID.77. When this informant was provided pre-recorded funds to purchase crack cocaine from Defendant Harden, the affidavit states that the informant "did not stay in contact with [the officer] after the buy." ECF No. 20-2, PageID.78. It is not entirely clear what this statement means, and the vague description of what happened makes this "controlled buy" of little use in the probable cause analysis. For example, the affidavit includes no details as to when or where this "controlled buy" took place, nor exactly what, if anything, was purchased. *See United States v. Hython*, 443 F.3d 480, 486 (6th Cir. 2006) ("More importantly, the affidavit offers no clue as to when this single controlled buy took place."). The second informant met with the detectives after he or she was arrested and explained that he or she could purchase crack cocaine from "T" (allegedly Defendant Harden), who lived at the Harbour Club Apartments. But "[t]his arrestee had no more contact with detectives after providing this information." ECF No. 20-2, PageID.78.

10

Here, the affidavit states that the affiant "personally met and interacted with" the first confidential informant, that the informant "has provided information that [the affiant] was able to independently verify as being accurate," and that the affiant has "concluded that [the confidential informant] is credible." ECF No. 20-2. PageID.77. But the affidavit includes no details about the basis of that conclusion, nor what information was independently verified or how that verification was done. While the affiant states that the information was verified, it is not clear whether the affiant is referring to information about Defendant Harden, or the affiant is referring to past investigations in which the informant provided information that was later verified, as contemplated by *Greene* and other cases in this Circuit. *Cf. United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000)(affiant's statement of informant's reliability was sufficient where affiant also stated that he had known the informant for five years and that the informant had given "information about individuals involved in criminal activity in the past that has proven to be reliable")(en banc); *United States v. Runyon*, 792 F. App'x 379, 384 (6th Cir. 2019)(affiant's statement that informant was reliable was sufficient where affiant also stated that police had worked with this informant for "two years," that the informant had helped conduct "eight controlled buys," and affiant had confirmed informant's reliability through "personal observation"); *United States v. Hughes*, No. 2:17-CR-20108-TGB, 2018 WL 9907105, at *5 (E.D. Mich. Aug. 7, 2018)(noting that a

confidential source had a proven record of reliability because he had "previously worked with DEA agents" and the tips were "verified by independent investigation"). Here, the affidavit contains no information about whether the first informant had assisted police in past investigations or otherwise provided reliable information in past cases. The second informant does not appear to have been known to police before his or her arrest, and no information is included as to the second informant's reliability.

Ultimately, the affidavit provided little information by which the Court could evaluate either of the two informants' reliability: the affidavit does not suggest that officers observed the "controlled buy" or any other purchases, tested any purchased narcotics, or had any knowledge that the informants had made previous narcotic purchases from Defendant Harden. *Cf. United States v. Pinson*, 321 F.3d 558, 563 (6th Cir.2003)("[T]he affidavit in this case contained Officer Mackall's personal observation, his pat down of the informant before and after the purchase of the narcotics, and the fact that the drugs purchased by the confidential informant were later tested positive for cocaine base.").

There were also two additional anonymous tips—one provided to a detective and one mailed to the police department—which stated that "T" was selling narcotics out of the Apartments. "Anonymous tips . . . demand more stringent scrutiny of their veracity, reliability, and basis of knowledge than reports from confidential informants." *United States v.*

12

*Helton*, 314 F.3d 812, 820 (6th Cir. 2003) Due to their anonymous nature, the affiant did not, and indeed could not, provide information on the anonymous tipsters' reliability. In sum, the affidavit lacks facts from which the issuing magistrate could have assessed the credibility of the informants and tipsters.

The Court now turns to the question of whether the information from the confidential informants and tipsters was corroborated and concludes that it was, but only in part. First, the accounts provided by the two informants and two tipsters are generally consistent with each other. All stated that Defendant Harden was dealing drugs out of the Harbour Club Apartments, and two gave fairly specific details about the car Defendant Harden drove. The similar details of these four tips, provided by four different people, tends to support the reliability and credibility of all the information. *See, e.g., United States v. Alford*, No. 16-CR-20003-SHL, 2016 WL 10922897, at *4 (W.D. Tenn. June 17, 2016), *aff'd*, 717 F. App'x 567 (6th Cir. 2017)(warrant was supported by probable cause where "[t]he affidavit . . . contained multiple anonymous tips reporting previous drug activity at [d]efendant's residence and a named informant describing a drug transaction at the same location close in time to the submission of the affidavit."); *United States v. Taylor*, No. 1:07CR68, 2007 WL 1115194, at *7 (N.D. Ohio Apr. 13, 2007), aff'd, 471 F. App'x 499 (6th Cir. 2012)("The consistency of each informant's statement with that of the others' indicates the overall reliability of the

individual sources."); *United States v. Martinez*, 106 F.3d 402 (6th Cir. 1997)(unpublished table opinion)("Here, there were six separate [known] informants. Two of them had provided reliable information in the past which led to drug seizures . . . The six different sources corroborated one another's stories.").

Second, subsequent police investigation confirmed some of the details provided. As the tipsters described, police found a white Chrysler 200 parked both at the Harbour Club Apartments and the Shadowlawn residence, and registration records showed that the Chrysler was linked to Defendant Harden—the vehicle was registered to Defendant Hubbard, Harden's girlfriend, and was associated with the Shadowlawn address, Harden's residence. ECF No. 20-2, PageID.77. But this corroboration was limited to the "innocent" details of the tips: that Defendant Harden was associated with the vehicle and the Apartments. Police did not see Harden dealing drugs, or otherwise directly confirm that Harden was involved in drug activity. *See United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009)("The affidavit contains no assertion that this informant is known to be reliable, nor did the police corroborate any of the informant's statements beyond the innocent fact that Higgins lived at the stated location[.]"); *but see United States v. Gregory*, 311 F. App'x 848, 858 (6th Cir. 2009)(anonymous tip that defendant had bomb-making materials in a storage unit he rented was corroborated by police's confirmation that the defendant in fact rented a storage unit); *United States v. Mayle*, 382

14

F. App'x 329, 332 (4th Cir. 2010) (probable cause was lacking but good faith exception applied where court acknowledged that supporting affidavit was "not great," but affidavit "referred to multiple [consistent] anonymous tips" and established "that deputies performed an independent investigation" that "corroborate[d] at least some of the information from the tips.").

While the affidavit lacked specific information supporting the reliability or credibility of the informants and tipsters, the information they provided was subsequently corroborated, at least in part. However, this corroboration was limited to "innocent details." Ultimately, the Court concludes that these tips are thus entitled to limited weight.

Beyond the limited information on the reliability of the informants/tipsters, however, there is another problem with the Dodge Durango warrant. While several confidential informants assert that Defendant Harden drove or owned a white Chrysler 200, none of the confidential informants or tipsters provided personal or second-hand knowledge regarding, or even *mentioned* the black Dodge Durango. In briefing and at oral argument, the Government appears to argue that evidence that a defendant is engaged in continuing and ongoing drug-trafficking is in and of itself sufficient to justify a search of the drug dealer's residence—and by extension, a vehicle at that residence. ECF No. 26, PageID.192-93. But the Sixth Circuit has "never held . . . that a suspect's 'status as a drug dealer, standing alone, gives rise to a fair

15

probability that drugs will be found in his home," and instead requires "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence; that is, . . . facts showing that the residence [or here, vehicle] had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) (quoting *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)). This sentiment is echoed in the Supreme Court's guidance that "[t]he critical element in a reasonable search *is not that the owner of property is suspected of crime* but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) (emphasis added).[1]

---

[1] In recent cases, the Sixth Circuit has explained that this "nexus" can sometimes established by showing that a drug dealer is engaged in "continual and ongoing operations typically involving large amounts of drugs." *United States v. Sheckles*, 996 F.3d 330, 342 (6th Cir. 2021); *United States v. Davis*, 751 F. App'x 889, 892 (6th Cir. 2018). The Court finds those cases factually distinguishable, as the facts in the Dodge Durango tracker affidavit do not sufficiently support the conclusion that Defendant Harden was engaged in a "continual and ongoing" drug dealing operation, much less one "involving large amounts of drugs." *Cf. Sheckles*, 996 F.3d at 342 (Defendant's drug activities were "continual and ongoing" where defendant was alleged to be part of an international drug conspiracy and was negotiating to purchase 10 kilograms of cocaine); *Davis*, 751 F. App'x at 891 (Defendant was part of "continual and ongoing" drug operation where he was arrested with 11 kilograms of cocaine in his vehicle).

Therefore, the Court must consider whether the affidavit contains specific evidence supporting a proper nexus between the Dodge Durango and the alleged drug activity. The evidence connecting the Dodge Durango to the alleged drug activity is: (1) that Defendant Harden drove the vehicle alone on several occasions; (2) that the vehicle was parked at the Harbour Club Apartments on at least two occasions; (3) that the vehicle was observed at 585 Shadowlawn; (4) that the vehicle was registered to Defendant Hubbard, just like the Chrysler 200; and (5) the affiant's statement that, in the affiant's experience, drug dealers often use vehicles to transport drugs to places where drugs are sold or stored. ECF No. 20-2 PageID.76-80.

In supplemental briefing, the Government argues that this case is similar to *United States v. Coleman*, where the Sixth Circuit upheld the district court's determination that an affidavit provided probable cause that a tracking device attached to the defendant's vehicle would uncover evidence of wrongdoing. 923 F.3d 450 (6th Cir. 2019). ECF No. 31, PageID.228. The warrant in *Coleman* was supported by five facts: (1) a confidential informant—who had been shown to be reliable—identified the defendant as a drug supplier; (2) police had been investigating several drug sales at the home of one of the defendant's alleged customers; (3) police saw the defendant drive the vehicle in question to the customer's house and stay for only four minutes; (4) the defendant had two prior

felony drug convictions; and (5) the vehicle in question was registered to the defendant's father. *Coleman*, 923 F.3d at 454.

The facts of *Coleman* are distinguishable. In this case, unlike *Coleman*, there was little information indicating that the informants were reliable. And while agents saw the defendant in *Coleman* use a different car during at least one controlled buy, here the affidavit details no direct observations of actual drug dealing. *Id.* at 453. At the same time, however, the Coleman court noted that courts "have upheld vehicle-tracking warrants based on much weaker factual allegations" than those present in *Coleman*. *Id.* at 454. Indeed, this case is close to those discussed by the *Coleman* court. In *United States v. McNeal*, the Fourth Circuit found that a tracker warrant was supported by probable cause where the affidavit established only that: (1) the vehicle was owned by the defendant's mother, (2) a reliable informant told police the vehicle had been used for bank robberies and casing banks, and (3) agents watched the defendant park the vehicle near two banks. 818 F.3d 141, 150 (4th Cir. 2016).

And in *United States v. Faulkner*, the Eighth Circuit—while acknowledging that it was a close call—found that a warrant with even less factual basis was nonetheless supported by probable cause. 826 F.3d 1139 (8th Cir. 2016). In that case, an informant told police that the defendant was trafficking heroin in Minneapolis, and provided police with two addresses frequented by the Defendant and two vehicles driven

18

by the defendant. *Id*. at 1142-43. The affidavit stated that the informant was reliable, but provided no information to support that conclusion. Police subsequently confirmed that the defendant was tied to both addresses, and owned the two vehicles the informant had described. But while police observed the vehicle that was ultimately tracked at both addresses and saw the defendant driving the vehicle, police never directly observed the vehicle used for drug activity. *Id*. at 1145. Here, as in *Faulkner*, informants of questionable reliability identified Harden as a drug trafficker, and police subsequently confirmed many of the innocent details in the informant's tips—but did not directly observe Harden dealing drugs. And here, as there, while police saw the vehicle at the addresses the tipster identified and saw the defendant driving it, police never definitively saw the vehicle in question used for drug activity. And here, as there, Harden's criminal history includes at least two prior drug felonies. *Id*. at 1144; ECF No. 20-3, PageID.96.

Considering these similar cases, the Court concludes that the affidavit's facts pertaining to the Dodge Durango come close to establishing probable cause, but are not enough. However, even if in retrospect the affidavit appears somewhat weak in establishing probable cause, the Court concludes that the investigating officers reasonably relied on it, so that evidence obtained as a result of tracking the Durango may still be admitted.

Even where a warrant was not supported by probable cause, the evidence obtained as a result of the search or seizure need not be suppressed when it was "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *U.S. v. Leon*, 468 U.S. 897, 922 (1984). The "good faith" exception will not apply, however, where the supporting affidavit was nothing more than "bare bones" that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *Leon*, 468 U.S. at 914-15, 923. A bare-bones affidavit is not one that lacks probable cause. As the Sixth Circuit has explained, "[a]n affidavit cannot be labeled "bare bones" simply because it lacks the requisite facts and inferences to sustain the magistrate's probable-cause finding; rather, it must be so lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, no reasonable officer would rely on it." *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017). But "[a]lthough the good-faith standard is less demanding than the standard for probable cause, the affidavit still must draw some plausible connection to the [particular place to be searched]." *United States v. Brown*, 828 F.3d 375, 385–86 (6th Cir. 2016).

The affidavit was not so devoid of facts connecting the Dodge Durango to the alleged drug dealing that no reasonable officer would rely on it. While the affidavit did not explicitly state that Defendant Harden

was using the Dodge Durango as a replacement for the Chrysler 200 to travel to and from places where drugs were sold or stored, a reasonable officer could draw that conclusion from several facts present in the affidavit. *See White*, 874 F.3d at 500 ("reasonable inferences that are not sufficient to sustain probable cause in the first place may suffice to save the ensuing search as objectively reasonable."). First, the Chrysler 200 had not moved in several weeks, so it was reasonable to infer that Defendant Harden was using a different vehicle. Second, Defendant Harden had been seen driving the Dodge Durango by himself several times, including on three near-consecutive days shortly before the warrant was issued. ECF No. 20-2, PageID.80. Third, the Dodge Durango was registered to Defendant Hubbard, just like the Chrysler 200 that the tipsters *did* describe. *Id*. at PageID.79. Fourth, the Dodge Durango was identified at two different locations both connected to Harden, including the Harbour Club Apartments—the location that the tipsters and informants had identified as the place where Harden was dealing drugs. These inclusion of these facts, coupled with Harden's history of drug crimes, are sufficient to make the affidavit more than a "bare bones" affidavit upon which no reasonable officer could rely.

　　For these reasons, the Court finds that the good faith exception applies, and that any evidence collected or derived from the GPS tracking of the Dodge Durango need not be suppressed.

21

### b. February 24, 2020 Warrant (Harbour Club Apartments and Shadowlawn residence)

The second contested search warrant was issued on February 24, 2020, and had two target locations: (1) an apartment located at SI94 Service Drive in Van Buren, Michigan, ("Harbour Club Apartment") and (2) a single-family home located at Shadowlawn Street in Inkster, Michigan ("Shadowlawn residence"). Defendant Harden asserts that the February 24, 2020 search warrant was not supported by probable cause because the supporting affidavit contained insufficient evidence to connect the alleged drug trafficking to the apartment unit or home that was searched.

### i.  The search of the Shadowlawn Residence

The Government points to a number of facts in the affidavit that it suggests are sufficient to establish probable cause to search both residences. As to the information provided by the anonymous tipsters and confidential informants, as discussed above in connection with the Dodge Durango tracker warrant, the affidavit lacks information about their reliability, and the information was only minimally corroborated. Moreover, the informants and tips provide no information concerning the Shadowlawn location at all. Accordingly, the information provided by the informants and tips do not independently support a finding of probable cause as to the Shadowlawn residence.

The affidavit also contains facts that trash pulls at Shadowlawn recovered two knotted, plastic sandwich bags as well as evidence of Defendant Harden's residency at the location. In addition, Harden had been observed going to and from the Shadowlawn address. Knotted sandwich bags, though perhaps consistent with drug trafficking, are in and of themselves common household items, and here it is not alleged that they contained or were tested for drug residue.

Defendant's residency at the Shadowlawn address and his alleged known drug dealing does not ipso facto justify a search. *U.S. v. Crockett*, 548 F.Supp.2d 435, 440 (E.D. Mich. 2008) (referencing *U.S. v. Frazier*, 423 F.3d 526, 532-33 (6th Cir. 2005). Unlike other cases in which probable cause has been found to search a Defendant's residence on the basis of their ongoing drug dealing, here Defendant Harden had not yet been arrested for drug trafficking (*see United States v. Kenny*, 505 F.3d 458, 461 (6th Cir. 2007) and there were not multiple controlled buys where Defendant drove from the site of the buy to the residence (*see United States v. Coleman*, 923 F.3d 450, 457 (6th Cir. 2019)). This case is more like *United States v. Higgins*, where the affidavit at issue relied on "an unproven tipster, with no evidence that the tipster observed narcotics or evidence of illegal drug sales associated with the defendant's residence." *Coleman*, 923 F.3d at 458 (discussing *United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009)). *See also United States v. Helton*, 314 F.3d 812 (6th Cir. 2003).

23

Finally, the single short stay that was observed at the Shadowlawn residence through digital surveillance does not provide evidence of narcotics trafficking—but rather, merely reaffirms that Defendant Harden resided at the Shadowlawn home. "Having frequent visitors, who stay a short time and then leave, is not necessarily indicative of criminal activity." *United States v. Ronnie Buffer*, 529 F. App'x 482, 484-85 (6th Cir. 2013)(quoting *United States v. King*, 230 F.3d 1361 (6th Cir. 2000)(unpublished table opinion)). Considering the totality of the facts alleged in the affidavit, they show Harden's connection to Shadowlawn, that Harden has a history of drug trafficking, and that there were knotted sandwich bags in the trash of Shadowlawn. These facts may provide some grounds for suspicion that drugs might be found at Shadowlawn, but they are insufficient to show a probability that evidence of drug trafficking would be likely to be found.

The Court now must consider whether any evidence derived from a search of the Shadowlawn residence must be excluded, or falls within the good faith exception outlined above. In a notice of supplemental authority (ECF No. 34), the government points the Court to *United States v. Reed*, 993 F.3d 441 (6th Cir. 2021). In *Reed*, the Sixth Circuit held that an affidavit detailing a suspect's ongoing drug activity—even if insufficient to create a proper nexus to the suspect's home supporting probable cause—was still sufficient to support a "minimally sufficient nexus" justifying police officers' good faith reliance on the warrant given the

Sixth Circuit's "unsettled jurisprudence" on when a suspect's ongoing drug dealing may justify a search of their home. *Id.* at 993 F.3d 444-45.

But in *Reed*, the Sixth Circuit highlighted several key facts that are not present here. First, a "reliable informant" had made two controlled drug purchases from the *Reed* defendant, one within the last twenty days, another within the last five. *Id.* at 451. Second, police had directly observed the defendant "engage in hand-to-hand transactions" with a number of individuals noting that "on some occasions the individuals would hand [the defendant] money and [the defendant] would in turn hand them a clear bag with an unknown substance." *Id.* at 445. The warrant in *Reed* provided significantly more evidence showing a record of ongoing drug trafficking than was present in this case. Here, there was not enough information in the affidavit to allow a reasonable officer to conclude that the was sufficient "ongoing drug activity" to justify a search of Defendant Harden's residence on Shadowlawn based just on that activity. Nor was there anything establishing a "minimally sufficient nexus" between the alleged drug dealing and the Shadowlawn residence that justified officers' reliance on the warrant: the anonymous tips make no mention of the Shadowlawn residence at all, and the affidavit identifies only a single "short stay" at the Shadowlawn residence. For these reasons, the Court concludes that the good faith exception does not apply, and any evidence seized as a result of the search of the Shadowlawn residence must be suppressed.

25

### ii.  The search of the Harbour Club Apartments

The affidavit in support of the search warrant for the Harbour Club Apartment includes facts that the others do not. First, as the affidavit explains, the "short stay" activity that is cited in support of all the warrants actually took place at the Harbour Club Apartments. Additionally, the affidavit states that on February 19, 2020 a minivan pulled into the parking lot at the Harbour Club Apartments, and the driver entered the building where Defendant's apartment was for about five minutes. ECF No. 20-3, PageID.101-102. Police stopped the minivan for a traffic infraction shortly thereafter and, during a consent search of the minivan, discovered "a silver, metal, cylindrical canister containing sever[al] small white 'rocks,'" a "clear glass smoking device . . . typically used for ingesting narcotics," and a "small clear plastic baggie containing several hard white and brown 'rocks.'" *Id.* at PageID.102. After being arrested, the minivan driver told police that all the items belonged to him, and that "they were a combination of heroin, crack, and possible crushed up pills." *Id.* The affidavit does not indicate that the minivan driver said anything about whether he had purchased the drugs at the Harbour Club Apartments or from Defendant Harden. *Id.* The affidavit also identifies a number of other short visits by various unknown people to the Harbour Club Apartments while Defendant Harden was present at the complex. ECF No. 20-3, PageID.100-103. The affidavit notes that

this "'short stay' traffic" is "consistent with drug trafficking." *Id.* at PageID.101.

The situation at hand is factually akin to that considered by the Sixth Circuit in *United States v. Ronnie Buffer*, 529 F. App'x 482, 485 (6th Cir. 2013). In that case, police had received an anonymous tip that the defendant was dealing drugs from his residence, and police observed numerous "short visits" at the residence. *Id.* at 483. When one vehicle leaving the residence was stopped for a traffic infraction, police discovered a small amount of marijuana. *Id.* The Sixth Circuit explained that this evidence, taken together, was insufficient to support a warrant:

> For two reasons, we conclude that the discovery of marijuana, even when taken together with the short visits and anonymous tip, did not create a substantial basis for determining that probable cause existed to search the Residence. First, there is no clear nexus between Sanders's possession of the marijuana and the Residence; it is entirely possible, for example, that Sanders already had the marijuana on his person when he arrived at the Residence. This conclusion is supported by the very small quantity of marijuana, the approximate equivalent of one marijuana cigarette, that Edwards found on Sanders—a quantity that hardly suggests a recent drug sale. Moreover, we note that Sanders did not admit to purchasing the marijuana at the Residence. Second, the affidavit says nothing about the allegedly criminal nature of the "transactions" that occurred. The affidavit reveals neither the manner in which the transactions took place nor what, if anything, was exchanged.

*Id.* at 485. This case is similar. For the reasons discussed above, the Court finds the anonymous tips to be of minimal value. And, just as in

27

*Buffer*, it is entirely possible that the minivan driver already had the drugs in his vehicle before he arrived at the Apartments. Nor is there any indication—beyond the fact that Defendant Harden was present at the building when the driver visited—that the minivan driver had obtained the drugs from Harden rather than one of the other residents of the Harbour Club Apartments. However, at the same time, the short stay visits were more substantial than those identified in *Buffer*. There, the Sixth Circuit rejected as insufficient an affidavit stating only that the affiant "observed 'several' visits" and specifying "neither the precise number of visits nor the time span of surveillance." *Buffer*, 529 F. App'x at 485. The Sixth Circuit concluded that "observation of as few as three visits, lasting as little as one minute each, over a possible twenty-four-hour span" was insufficient to support a finding of probable cause. *Id.*

In this case, the affidavit was more detailed and specific. The affidavit identified in detail three "short visits" over the course of about half an hour on February 18, 2020 while Harden was present at the Apartments. ECF No. 31-3, PageID.277. The affidavit also details four short visits on February 24, 2020 over the course of about an hour, also while Harden's vehicle was present at the Apartments. *Id.* at PageID.278. That brings this case closer to *United States v. Joye*, 454 F. Supp. 3d 675, 685 (E.D. Mich. 2020), in which the district court concluded that sixteen short visits to a defendant's home involving hand-to-hand transactions—all detailed specifically in a supporting affidavit—were

sufficient to support a search warrant for the home. *See also United States v. Henley*, No. 2:15-CR-20644, 2016 WL 11735389, at *4 (E.D. Mich. June 17, 2016) (noting in dicta that "[t]hree brief visits during a twenty minute period, for example, is more probative of drug sales than three brief visits over the course of a day."). While the affiant in this case did not appear to observe any hand-to-hand transactions, the affidavit detailed several short visits, all close in time to one another, all while Defendant Harden was present. Furthermore, one person, the minivan driver, was caught with illegal narcotics just after making such a visit to the Harbour Club Apartments.

As to the confidential informants, the affidavit still fails to provide any information as to why the information provided is reliable. However, all of the informants and tipsters did specifically identify the Harbour Club Apartments as the site of Harden's drug dealing. Taken together, the informant statements and anonymous tips—coupled with detailed descriptions of several short stay visits, the seizure of the same type of drug from the minivan that tipsters said Harden was selling, and Defendant Harden's criminal history of multiple drug felonies—is enough to establish a bare minimum of probable cause.

Moreover, even if the facts in the affidavit could be said to miss the mark of probable cause, they were so close that a reasonably well-trained officer would be justified in relying on the warrant. The affidavit clearly identified a "minimally sufficient nexus" in which there was "some

29

connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched." *United States v. Reed*, 993 F.3d 441, 451 (6th Cir. 2021). Therefore, the Court concludes that the warrant to search the Harbour Club Apartments was supported by probable cause and, even if probable cause was lacking, police reliance on the warrant to search the Harbour Club Apartments was not unreasonable and the *Leon* good faith exception applies. Therefore, the evidence will not be suppressed.

### c. February 25, 2020 Warrant

The third search warrant that is challenged was issued on February 25, 2020, and had one target location: a rental storage unit on Middlebelt Road in Romulus, Michigan. Defendant Harden argues that the storage unit warrant was not supported by probable cause.[2]

---

[2] Defendant Harden may also be arguing that the storage unit would not have been discovered but for the illegal first search of the Shadowlawn residence. Defendant Harden's counsel briefly mentioned this at the hearing held in this matter, see ECF No, 26, PageID.177, but the argument was not raised in Defendant Harden's supplemental brief. Even if Harden does seek to raise that argument, the Court does not accept it, because the storage unit would have been discovered through the use of the GPS tracker–indeed the GPS tracker was already in place when the Shadowlawn search was executed, and had already tracked the Dodge Durango to the ABC Storage facility several times. Thus "routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *United States v. Hodge*, 714 F.3d 380, 387 (6th Cir.2013).

As to probable cause, the storage unit warrant was supported by six things: (1), the common allegations regarding the short visits, tipsters, and Defendant Harden's criminal record contained in the other warrant affidavits; (2), that the unit was registered to Defendant Hubbard; (3), that on three occasions, Defendant drove from the Shadowlawn residence to the storage unit, stayed for less than five minutes, then drove to the Harbour Club Apartments; (4), that police officers surveilling the storage facility saw the Dodge Durango arrive a few hours after the Shadowlawn and Harbour Club Apartments warrants were executed, then leave abruptly; (5) that keys to the storage locker were discovered during the search of 525 Shadowlawn[3] and (6), the affiant's statement that, in their

---

[3] As discussed above, the first search of the Shadowlawn residence must be suppressed. But mere inclusion of tainted evidence in a search warrant affidavit does not taint the warrant or compel exclusion of evidence seized pursuant to that warrant. *United States v. Bah*, 794 F.3d 617, 634 (6th Cir. 2015). Instead, courts remove the illegally obtained fact and consider whether there is still sufficient information to establish probable cause. *Id*. Putting aside any argument that investigators would have inevitably discovered the keys during their second, legal, search of the Shadowlawn residence, the Court concludes that when any mention of the keys is removed from the affidavit, there is still sufficient information to establish probable cause. The keys are not probative of whether drugs would be found in the unit, but rather would show a connection between the Defendants and the unit. That connection is amply shown by other evidence: Defendant Hubbard is connected to the unit by virtue of her being the named renter on the unit, and Defendant Harden is connected to the unit by GPS tracking of the Dodge Durango.

experience, drug traffickers store narcotics, narcotics proceeds, and related records in storage units. ECF No. 31, PageID.245-246.

Just as with the other warrants, the Court finds little evidence of reliability as to the informants/tipsters, and the tips do not mention a storage unit. But the remaining information is sufficient to support probable cause. First, the affidavit includes the common information regarding Defendant Harden's criminal history, the short stay visits at the Harbour Club Apartments, and a statement by the affiant that drug traffickers often store drugs or other evidence in storage units. The GPS tracking data showed that, on at least three occasions, Harden visited the storage unit before traveling to the Harbour Club Apartments. From this pattern of activity, a reasonable inference could be drawn that Defendant Harden was collecting drugs from the storage unit to be sold at the Harbour Club Apartments. Courts in this district and elsewhere in the Sixth Circuit have found search warrants to be supported by probable cause on similar facts. *See United States v. Thompson*, No. 05-80750, 2006 WL 3105351, at *8 (E.D. Mich. Oct. 31, 2006)(Cohn, J.)(warrant to search storage unit was valid where informant told investigators that an ongoing drug dealing operation was running out of a carwash, police observed suspicious behavior at the car wash, and vehicle was loaded with duffel bag at car wash then driven to the storage unit.); *United States v. Davis*, No. 1:13-CR-224, 2015 WL 1726760, at *1-3 (W.D. Mich. Apr. 15, 2015)(warrant to search storage unit was

supported by probable cause where defendant visited storage unit shortly after one controlled buy and shortly before a second controlled buy); *United States v. Daniels*, No. 3:19-CR-177-CRS, 2020 WL 7634591, at *9 (W.D. Ky. Dec. 22, 2020)(warrant was supported by probable cause where surveillance showed that the defendant "made trips [to the storage unit] before and after conducting short stays in residential areas," and where police saw the defendant store a vehicle in the storage unit that detective "believed" had been involved in criminal activity); *United States v. Payne*, No. 1:19CR103, 2020 WL 4284926, at *3 (S.D. Ohio July 27, 2020)(warrant to search storage unit was supported by probable cause where an informant told police that they believed the defendant was using a storage unit to "facilitate" his drug trafficking, and GPS tracking of defendant's vehicle revealed him visiting the storage facility).

Additionally, shortly after the search warrants for the Shadowlawn residence and Harbour Club Apartments were executed, the Dodge Durango appeared at the storage facility. ECF No. 20-4, PageID.122-23. This is inherently suspicious, and supports the reasonable inference that someone associated with Defendant Harden sought to remove evidence from the storage unit after learning of the police investigation. That inference is supported by the fact that, upon seeing police officers at the storage facility, the Dodge Durango seems to have departed the storage facility without completing any business there. *Id.* For these reasons the

33

Court concludes that the February 25, 2020 warrant to search the ABC Storage unit was supported by probable cause.

### d. March 5, 2020 Warrant

The fourth search warrant was issued on March 5, 2020, and authorized a second search of the Shadowlawn residence.[4] ECF No. 31-5. Defendant Harden argues that the warrant did not offer sufficient information to conclude that the warrant was "anything more than 'bare bones.'" ECF No. 27, PageID.216. However, unlike the earlier warrant to search the Shadowlawn residence, the March 5 warrant contained detailed, specific information identifying a nexus between the Defendant's alleged drug dealing and the residence.

The main information in the supporting affidavit for that warrant is derived from recordings of jail phone calls made in early March between Defendants Harden and Hubbard. These jail calls, detailed in the supporting affidavit for the March 5 warrant, provided sufficient probable cause to search the Shadowlawn residence. The calls indicated

---

[4] It appears that on the same day, police also obtained a warrant to search the Harbour Club Apartments unit a second time. *See* ECF No. 31-5, PageID.312 ("A search warrant for the common area of 48631 S I94 Service Dr Apt # 205 . . . (Harbo[u]r Club Apartments) was reviewed and approved . . . on March 5th 2020." Defendant Harden does not appear to challenge this second search of the Harbour Club Apartments address. Even if Defendant Harden challenged that search, his challenge would fail for the same reasons his challenge to the second search of the Shadowlawn residence fails: the jail calls provide probable cause for both searches.

that Defendant Hubbard had taken drugs from the Harbour Club Apartments and brought them to the Shadowlawn home, that she had "cooked" narcotics at the Shadowlawn home, and that she planned to continue dealing narcotics. As the Supreme Court has explained, "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *United States v. Harris*, 403 U.S. 573, 583 (1971). As such, the affidavit was enough to support probable cause to believe that evidence of the Defendants' drug dealing would be found by a second search of the Shadowlawn home, and any evidence seized as a result of that search need not be excluded.[5]

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 20) is **GRANTED IN PART** and **DENIED IN PART**. In sum, the

---

[5] Defendants do not appear to challenge the legality of Harden's arrest, so the issue of whether the jail calls themselves should be suppressed is not before the Court. But even if Harden's arrest were successfully challenged, the Court could not conclude that Harden's entirely voluntary statements on the jail phone—made about a week after his detention and not to police officers but to his co-conspirator—should be suppressed as fruits of a tainted arrest. *See United States v. Gross*, 662 F.3d 393, 402 (6th Cir. 2011)(confession volunteered by defendant two months after unconstitutional stop while defendant was detained on an outstanding arrest warrant was "sufficiently attenuated" to purge any taint associated with the illegal stop); *United States v. Akridge*, 346 F.3d 618, 628 (6th Cir. 2003) (finding "most dispositive" the "degree of free will" exercised by defendants and the "temporal attenuation" between illegal search and inculpatory statements).

Court concludes that: (1) the February 3 warrant to track the Dodge Durango lacked sufficient probable cause, but the good faith exception applies; (2) the February 24 warrant to search the Shadowlawn residence lacked sufficient probable cause, and the good faith exception does not apply; (3) the February 24 warrant to search the Harbour Club Apartments was minimally supported by probable cause and in any event the good faith exception applies; (4) the February 24 warrant to search the ABC Storage unit was supported by probable cause; and (5), the March 5 warrant for a second search of the Shadowlawn residence was supported by probable cause. Any evidence seized as a result of the first search of the Shadowlawn residence will be excluded. Any evidence seized as a result of the searches of the Harbour Club Apartments, the ABC Storage unit and the **second** search of the Shadowlawn residence may be admitted.

**IT IS SO ORDERED.**

Dated: November 24, 2021        s/Terrence G. Berg
                                TERRENCE G. BERG
                                UNITED STATES DISTRICT JUDGE